MICHAEL J. HEYMAN
United States Attorney

ADAM ALEXANDER
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, AK 99513-7567
Phone: (907) 271-5071
Email: Adam.Alexander@usdoj.gov

JOHN EISENBERG
Assistant Attorney General
United States Department of Justice
National Security Division
LESLIE ESBROOK
Trial Attorney
950 Pennsylvania Avenue, NW
Washington, DC 20530
Email: Leslie.Esbrook@usdoj.gov

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    vs.<br><br>SERGEY NEFEDOV and MARK SHUMOVICH,<br><br>    Defendants. | No. 3:24-cr-00059-SLG-MMS<br><br>COUNT 1:<br>CONSPIRACY<br>  Vio. of 18 U.S.C. § 371<br><br>COUNTS 2-3:<br>VIOLATION OF THE EXPORT CONTROL REFORM ACT AND THE EXPORT ADMINISTRATION REGULATIONS<br>  Vio. of 50 U.S.C §§ 4819(a)(1); (a)(2)(A), (a)(2)(F); (b); and 15 C.F.R. §§ 736.2(b), 746.10, 758, 764.2, and Supp. No. 5 to Part 746 and 18 U.S.C. § 2 |

COUNT 4:
SMUGGLING GOODS FROM THE
UNITED STATES
   Vio. of 18 U.S.C. §§ 554 and 2

COUNTS 5-6:
SUBMITTING FALSE OR MISLEADING
EXPORT INFORMATION
   Vio. of 13 U.S.C. § 305 and 18 U.S.C.
§ 2

COUNT 7:
CONSPIRACY TO COMMIT MONEY
LAUNDERING
   Vio. of 18 U.S.C. § 1956(h)

COUNTS 8-12:
INTERNATIONAL MONEY
LAUNDERING
   Vio. of 18 U.S.C. §§ 1956(a)(2)(A)
and  2

CRIMINAL FORFEITURE
ALLEGATION 1:
   18 U.S.C. § 981(a)(1)(C); 22 U.S.C.
§ 401; 21 U.S.C. § 853; 28 U.S.C. §
2461(c); 50 U.S.C. § 4819(d); and Fed. R.
Crim. P. 32.2(a)

CRIMINAL FORFEITURE
ALLEGATION 2:
   13 U.S.C. § 305(a)(3); 21 U.S.C. § 853;
28 U.S.C. § 2461(c); and Fed. R. Crim. P.
32.2(a)

CRIMINAL FORFEITURE
ALLEGATION 3:
   18 U.S.C. § 982(a)(1); 21 U.S.C. § 853;
28 U.S.C. § 2461(c); and Fed. R. Crim. P.
32.2(a)

//

## FIRST SUPERSEDING INDICTMENT

The Grand Jury charges that:

## INTRODUCTORY ALLEGATIONS

At all times relevant to this Indictment (unless otherwise stated herein):

1.      Defendant SERGEY NEFEDOV was a naturalized U.S. citizen who was born in Russia and resided in the District of Alaska. NEFEDOV owned Alaska Sled Tours LLC and Absolut Auto Sales LLC, which were both registered as licensed businesses at NEFEDOV's residential address in the District of Alaska. Alaska Sled Tours LLC was registered in the District of Alaska in August 2022 as a scenic and sightseeing transportation business. Absolut Auto Sales LLC was registered in the District of Alaska in 2008 as a car sales company.

2.      Defendant MARK SHUMOVICH was a naturalized U.S. citizen who was born in Russia and resided in the State of Washington.

3.      Co-conspirator 1 ("CC-1") was a Russian national who owned a company located in Russia ("Russian Company"). CC-1 was a vendor of snow machines and other motorsport vehicles.

4.      Co-conspirator 2 ("CC-2") was a Russian national who owned a company located in Hong Kong ("Hong Kong Company").

5.      From March 16, 2022, until September 14, 2022, and again beginning on May 19, 2023, following Russia's full-scale invasion of Ukraine on February 24, 2022, Bombardier Recreational Products ("BRP")-manufactured Ski-Doo snow machines (hereinafter "snow machines") required a license from the Department of Commerce for

export to Russia regardless of their per unit value.

6.     At no time did NEFEDOV, SHUMOVICH, Absolut Auto Sales, or Alaska Sled Tours apply for, receive, or possess a license or authorization from the Department of Commerce to export or reexport snow machines to Russia.

### RELEVANT LEGAL AUTHORITIES RELATED TO THE NATIONAL SECURITY

7.     The Export Control Reform Act ("ECRA") provides, among other things, that the national security and foreign policy of the United States require that the export, reexport, and in-country transfer of items be controlled, 50 U.S.C. § 4811, and grants the President the authority to control such activities, *id.* § 4812. ECRA further grants to the Secretary of Commerce the authority to establish the applicable regulatory framework. *Id.* § 4813.

8.     The Export Administration Regulations ("EAR"), 15 C.F.R. Parts 730-774, restricts the export of items for national security, foreign policy, and other interests in the United States as reflected in international obligations and arrangements. 15 C.F.R. § 730.6. It also restricts exports of items that could make significant contributions to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States. *Id.* § 742.4. The EAR imposes licensing and other requirements for items subject to the EAR to be lawfully exported from the United States or lawfully reexported from one foreign destination to another. *Id.* § 730.7.

9.     The International Emergency Economic Powers Act ("IEEPA") grants the President the authority to deal with any unusual and extraordinary threat to the national

security, foreign policy, and economy of the United States if the President declares a national emergency with respect to such threat. *See* 50 U.S.C. § 1701 *et seq*.

10.    Pursuant to that authority, on April 15, 2021, the President issued Executive Order 14024, which declared a national emergency with respect to "specified harmful foreign activities of the Government of the Russian Federation," including its efforts "to undermine security in countries and regions important to United States national security; and to violate well-established principles of international law, including respect for the territorial integrity of states." 86 Fed. Reg. 20,249 (Apr. 19, 2021).

11.    On March 8, 2022, the President issued Executive Order 14066, which expanded the national emergency declared in Executive Order 14024, stating "the Russian Federation's unjustified, unprovoked, unyielding, and unconscionable war against Ukraine, including its recent further invasion in violation of international law, including the United Nations Charter, further threatens the peace, stability, sovereignty, and territorial integrity of Ukraine." 87 Fed. Reg. 13,625 (Mar. 10, 2022).

12.    On March 11, 2022, the President issued Executive Order 14068, which took additional steps with respect to the national emergency declared in Executive Order 14024 and expanded by Executive Order 14066. 87 Fed Reg. 14,381 (Mar. 15, 2022). Among other things, Executive Order 14068 prohibits "the exportation, re-exportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of luxury goods, and any other items as may be determined by the Secretary of Commerce, in consultation with the Secretary of State and the Secretary of the Treasury, to any person located in the Russian Federation." *Id.*

13.     On March 16, 2022, pursuant to ECRA, IEEPA, and Executive Order 14068, and in response to Russia's full-scale invasion of Ukraine, which "flagrantly violates international law, is contrary to U.S. national security and foreign policy interests, and undermines global order, peace, and security," the Department of Commerce promulgated a final rule imposing "restrictions on the export, reexport, or transfer (in-country) to or within Russia or Belarus of 'luxury goods' under the [EAR] and for exports, reexports and transfers (in-country) worldwide to certain Russian or Belarusian oligarchs and other malign actors supporting the Russian or Belarusian governments." 87 Fed. Reg. 14,785 (Mar. 16, 2022).

14.     Pursuant to this rule, and subject to certain limited exceptions not otherwise applicable here, a license from the Department of Commerce is required to export or reexport to Russia any "luxury good" subject to the EAR. 15 C.F.R. § 746.10(a)(1).[1] From March 16 until September 14, 2022, the term "luxury good" included "vehicles designed for traveling on snow." Beginning May 19, 2023, the term "luxury good" included "passenger motor vehicles specially designeed [sic] for traveling on snow." 15 C.F.R. Part 746 Supp. No. 5.[2] Applications for licenses to export or reexport subject items to Russia are generally subject to a policy of denial. 15 C.F.R. § 746.10(b).

15.     Under ECRA, it is a crime to willfully violate, attempt to violate, conspire to

---

[1] As of June 12, 2024, license requirements from 15 C.F.R. § 746.10 are found in 15 C.F.R. § 746.8.

[2] Between September 15, 2022, and May 18, 2023, 15 C.F.R. Part 746 Supp. No. 5 defined "luxury good" to include "vehicles designed for traveling on snow, and valued at $50,000 per unit wholesale price in the U.S." The snowmachines that Defendants attempted to export were not valued at $50,000 per unit wholesale in the U.S.

violate, or cause a violation of any regulation, order, license, or authorization issued pursuant to ECRA, including specific prohibitions described therein. 50 U.S.C. § 4819. Among the specified prohibitions, it is unlawful for any person to engage in any conduct prohibited by or contrary to, or refrain from engaging in any conduct required by, the EAR. § 4819(a)(2)(A). It is further unlawful for any person to make any false or misleading representation, statement, or certification, or falsify or conceal any material fact, to the Department of Commerce, in connection with the preparation or submission of any export control document or in connection with effecting any export or reexport of an item subject to the EAR. 50 U.S.C. § 4819(a)(2)(F).

## **EXPORT AND SHIPPING RECORDS**

16. Pursuant to U.S. law and regulations, exporters or their authorized agents, such as shippers or freight forwarders, are required to file certain forms and declarations concerning the export of goods and technology from the United States. Typically, those documents are filed electronically through the Automated Export System ("AES"), which is administered by the U.S. Department of Homeland Security, Customs, and Border Protection ("CBP").

17. The Electronic Export Information ("EEI") (formerly known as the Shipper's Export Declaration ("SED")) is the required documentation submitted to the U.S. Government through the AES in connection with an export shipment from the United States. Exporters or their authorized agents are required to file accurate and truthful EEI for every export of goods from the United States with a value of $2,500 or more. The EEI

also is required regardless of the value of the goods if the goods require an export license. 15 C.F.R. §§ 30.2, 758.1.

18.     The purpose of these requirements is to strengthen the U.S. Government's ability to prevent the export of certain items to unauthorized destinations and end users because the EEI and AES aid in targeting, identifying, and when necessary, confiscating suspicious or illegal shipments prior to exportation. 15 C.F.R. § 30.1(b).

19.     In addition, the BIS-711 Form, titled "Statement by Ultimate Consignee and Purchaser", is a form submitted to the Department of Commerce by exporters, shippers, and freight forwarders that requires the identification of the end user and end use of goods to be exported from the United States. *See* 15 C.F.R. § 748.11. The BIS-711 Form seeks assurances from the ultimate consignee and purchaser that the items will not be misused, transferred, or reexported in violation of the EAR. The BIS-711 Form requires the ultimate consignee and purchaser to certify, among other things, that all of the facts contained in the form are true and correct and to acknowledge that the making of any false statements or concealment of any material fact in connection with the form may result in imprisonment or fine, or both and denial, in whole or in part, of participation in U.S. exports and reexports.

20.     A material part of the EEI and AES, as well as other export filings, including the BIS-711 Form, is information concerning the end user and ultimate destination of the export. The identity of the end user may determine whether the goods: (a) may be exported without any specific authorization or license from the U.S. Government; (b) may be

exported with the specific authorization or licenses from the U.S. Government; or (c) may not be exported from the United States.

## **COUNT 1**
Conspiracy to Commit Offenses Against the United States
(18 U.S.C. § 371)

21.     Paragraphs 1 through 20 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

22.     Beginning no later than on or about March 16, 2022, and continuing to at least in or about May 2023, the exact dates being unknown to the Grand Jury, in the District of Alaska and elsewhere, Defendants NEFEDOV and SHUMOVICH, together with others known and unknown, including individuals associated with Hong Kong Company and Russian Company, did knowingly and willfully combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit:

> a. To willfully export and cause the export of snow machines from the United States to Russia without first having obtained the required license or authorization from the Department of Commerce, in violation of Title 50, United States Code, Section 4819(a)(1), 4819(a)(2)(A), and 4819(b); and Title 15, Code of Federal Regulations, Parts 736.2(b), 746.10, and 764.2, and Supplement No. 5 to Part 746;

> b. To knowingly submit false and misleading export information through the EEI and the AES, and cause the same, in violation of Title 13, United States Code, Section 305;

c. To fraudulently and knowingly export and send from the United States merchandise, articles and objects contrary to laws and regulations of the United States and receive, conceal, buy, sell, and facilitate the transportation, concealment, and sale of such merchandise, articles, and objects, prior to exportation, knowing the same to be intended for exportation contrary to laws and regulations of the United States, in violation of Title 18, United States Code, Section 554(a); and

d. To defraud the United States Department of Commerce by interfering with and obstructing a lawful government function, that is, the enforcement of laws and regulations prohibiting the export and supply of goods from the United States to restricted parties and foreign destinations without a license or authorization, by deceit, craft, trickery, and dishonest means.

## THE CONSPIRACY TO EXPORT SNOW MACHINES

**A.    Objects of the Conspiracy**

23.    The objects and purpose of the conspiracy were for the defendants and others known and unknown to the Grand Jury:

a. To export snow machines from the United States to Russia without first having obtained a license or authorization from the Department of Commerce;

b. To deceive and mislead the Department of Commerce by filing and causing the filing of false documents in connection with the export of

snow machines from the United States; and

c. To enrich members of the conspiracy through, among other things, the procurement, sale, and export of snow machines from the United States to Russia.

**B.  The Manner and Means of the Conspiracy**

24.  The manner and means by which the defendants and others known and unknown to the Grand Jury sought to accomplish and did accomplish the objects and purposes of the conspiracy included the following:

a. It was part of the scheme that CC-1's Russian Company contracted with CC-2's Hong Kong Company, which in turn contracted with NEFEDOV's company Absolut Auto Sales LLC, to obtain export-controlled snow machines from the United States, thereby concealing the involvement of CC-1 and Russian Company in the scheme;

b. It was further part of the scheme that NEFEDOV and SHUMOVICH communicated with U.S.-based snow machine distributors and purchased snow machines from those companies on behalf of and at the direction of CC-1, and in purchasing the snow machines, NEFEDOV and SHUMOVICH provided false information to the U.S. companies;

c. It was further part of the scheme that NEFEDOV and CC-1 communicated directly about the procurement of snow machines for CC-1's Russian Company and sought to conceal their communications through a newly created email account and cloud-based file sharing;

d.  It was further part of the scheme that NEFEDOV, SHUMOVICH, and other co-conspirators, including CC-1 and CC-2, sought to export snow machines from the United States to Russia through Hong Kong to conceal that Russia was the ultimate end destination;

e.  It was further part of the scheme that NEFEDOV and SHUMOVICH communicated with U.S.-based freight forwarders and arranged for transport of the snow machines from the United States to Hong Kong, all while knowing that the snow machines would then be shipped from Hong Kong to Russia;

f.  It was further part of the scheme that NEFEDOV and SHUMOVICH falsified and caused to be falsified export and shipping documents, including by falsely identifying the ultimate consignee as being in South Korea and the purchaser as being in Hong Kong, to conceal that Russia was the ultimate destination and CC-1's Russian Company was the ultimate consignee;

## C.    Overt Acts

25.    In furtherance of the conspiracy and in order to effect the objects thereof, the defendants NEFEDOV, SHUMOVICH, and their co-conspirators, did commit, among others, the following overt acts in the District of Alaska and elsewhere:

a.    On or about February 28, 2022, using an end-to-end encrypted messaging platform, an associate using a phone number with a Russian country code messaged SHUMOVICH asking about the

situation with sanctions and if they would be able to ship everything. SHUMOVICH replied that there is not much going on yet, but since they had South Korea, he did not think they would have problems.[3]

b. In or about May 2022, using an end-to-end encrypted messaging platform, SHUMOVICH exchanged text communications with another associate, whose name included "Korea" in SHUMOVICH's contacts (hereinafter "Korea Contact"), in which they discussed the customs process in Russia.

c. Beginning in or around June 2022 and continuing through at least in or around January 2023, NEFEDOV forwarded more than twenty (20) price quotes for snow machines from U.S.-based distributors to CC-1 by email, along with messages from freight forwarders, shipping quotes, and snow machine Certificates of Origin.

d. On or about May 12, 2022, CC-1 emailed an employee at a freight forwarding company, noting that deliveries of "official equipment" to the Russian Federation "have been stopped," and listing snow machines that CC-1 wanted to purchase. CC-1 wrote "If it's not possible to deliver to Vladivostok, then I suggest delivering the order in Hong Kong in the name of a company registered in Hong Kong and from there this company will send it to Vladivostok." In a follow up

---

[3] All translations herein and summaries of translations from Russian are preliminary.

thread on or about July 5, 2022, CC-1 inquired about "delivery ETA from the USA to Vladivostok, taking into account transit in a third country," and the employee replied that it was not "comfortable" for the freight forwarder to "deal with them in America," but that "You [CC-1] have your own representative in the United States who could do this."

e.    On or about July 21, 2022, NEFEDOV registered a new email account. That same day, CC-1 shared with NEFEDOV via the new email account links to two folders from CC-1's shared drive entitled "USA BRP Confidentiality" and "BRP Dealers USA."

f.    On or about July 27, 2022, CC-1 emailed CC-2 a contract between CC-1's Russian Company and CC-2's Hong Kong Company that provided for the purchase of $1 million USD worth of materials shipped to Russian Company from Hong Kong Company. In the body of the email, CC-1 asked CC-2 to set up a business account with one of three foreign banks that receives money from Russian Company's bank. CC-1 also provided CC-2 with business details and banking information for Absolut Auto Sales LLC and its owner, NEFEDOV, and stated that it was important that the document did not "have Russian names there, it would be better if you show a name of a local person." CC-1 also asked CC-2 to provide a blank invoice form and stated that CC-1 would "enter into it the cargo shipped from USA"

"ourselves, to avoid mistakes and from consequences on the RF border with their prices." CC-1 told CC-2 that Hong Kong Company "can add their own expenses" to the invoice "and their own % on a separate line."

g.     On or about July 27, 2022, CC-1 emailed a known co-worker about the creation of a contract between CC-2's Hong Kong Company and Absolut Auto Sales. The co-worker proposed removing the NEFEDOV's e-mail because it was a "Russian name," and, in a separate email, stated that "if Nefedov uses this address to correspond with the dealer, it would be better for him to get a new address, simply with the name of the company ABSOLUT …."

h.     Between on or about July 27, 2022, and July 29, 2022, CC-1 emailed CC-2 details for a contract between Hong Kong Company and Absolut Auto Sales LLC. CC-1 sent CC-2 a link to a foreign exchange rate website and discussed conducting transactions in RMB/CNY (Chinese currency) [4] because of restrictions on payments in U.S. dollars. CC-1 wrote "I am waiting for a signed contract from you and I am ready to make payments on accounts at your address. P.S. 2% of capital turnover for amounts @yield." CC-1 also told CC-2 that he

---

[4] CNY refers to Chinese yuan. RMB refers to renminbi. RMB is the official currency of China; the yuan is a unit of account for that currency. The terms used herein reflect the description as used in the referenced document.

was "Expressing 100% readiness from my side to start working." CC-1's signature block provided his address in Russia and telephone, fax, and mobile numbers with a Russian country code, and CC-1 emailed from an IP address that resolves to Russia.

i.      On or about July 28, 2022, as part of the exchange between CC-1 and CC-2, CC-1 emailed CC-2 invoices for sales from Absolut Auto Sales LLC to CC-2's Hong Kong Company for the purchase of snow machines and other motorized equipment. Each invoice ranged in total cost from approximately $75,000 to $90,000. On a date unknown, the aforementioned invoices were added to CC-1's "USA BRP Confidentiality" shared drive folder.

j.      On or about July 30, 2022, CC-2 sent CC-1 a signed final copy of the contract, which included the total cost of goods to be shipped to Russian Company in Chinese Yuan. That same day, CC-1 confirmed receipt and stated that he was "working on payments for the invoices," and suggested working in Chinese Yuan "from the start," because "after 8/8 it will be impossible to make payments in USD."

k.      Between on or about July 27, 2022, and on or about July 29, 2022, NEFEDOV and CC-1 exchanged emails regarding quotes for the purchase of snow machines and other motorsport vehicles from U.S.-based distributors. CC-1 instructed NEFEDOV to ask a U.S. supplier whether the purchase needed to happen in person and if the buyers

needed to coordinate their own shipping. CC-1 also provided NEFEDOV with a list of questions to ask potential U.S. suppliers, including questions related to shipping, taxes, delivery costs, and freight rates for shipment from Seattle, Washington to Hong Kong. CC-1 instructed NEFEDOV to obtain invoices from multiple U.S. suppliers of snow machines in response to the quotes that NEFEDOV had sent CC-1.

l.    At a date unknown, a document on CC-1's shared drive recorded that on or about August 2, 2022, CC-1's Russian Company sent CC-2's Hong Kong Company 1,247,000 RMB (approximately $184,228 USD as of August 2, 2022). The document further recorded that CC-1's Russian Company sent CC-2's Hong Kong Company additional funds on or about August 9, 2022, August 11, 2022, and October 4, 2022, for a total of approximately 4,163,210 RMB ($585,047 USD as of October 4, 2022), and recorded that the funds were for payment to Absolut Auto Sales and for 2% payments to Hong Kong Company.

m.    On or about August 4, 2022, NEFEDOV forwarded a shipping quote from a U.S.-based shipping company ("U.S. Company 1") to CC-1.

n.    On or about August 5, 2022, CC-2 requested permission to edit documents in the shared drive that CC-1 had previously shared with NEFEDOV, as described in paragraph 25(e).

//

o.      On or about August 5, 2022, Hong Kong Company sent a wire transfer from Hong Kong to an Alaska-based bank account in the name of Absolut Auto Sales and owned by NEFEDOV ("Bank Account 1") for approximately $1,975.

p.      On or about August 9, 2022, Hong Kong Company sent a wire transfer from Hong Kong to NEFEDOV's Bank Account 1 for approximately $174,975.

q.      On or about August 10, 2022, NEFEDOV withdrew $1,000 from Bank Account 1 at a U.S. snow machine distributor ("U.S. Distributor 1").

r.      On or about August 11, 2022, CC-1's Russian Company sent a wire transfer to CC-2's Hong Kong Company for 1,323,000 CNY (approximately $196,765 USD as of August 11, 2022). The payment details of the wire stated that it was a "Prepayment for snow machine CONTRACT No. HK-PK-01 date 27.07.2022."

s.      On or about August 11, 2022, NEFEDOV forwarded questions from U.S. Company 1 about snow machines to CC-1.

t.      On or about August 12, 2022, a U.S. snow machine distributor ("U.S. Distributor 2") received $500 from NEFEDOV's Bank Account 1.

u.      On or about August 15, 2022, Hong Kong Company sent a wire transfer to another Alaska-based bank account in the name of Absolut Auto Sales ("Bank Account 2") for approximately $97,122.

v.      On or about August 17, 2022, Hong Kong Company sent a wire transfer to Bank Account 2 for approximately $187,212.

w.      On or about August 18, 2022, and August 23, 2022, NEFEDOV shared a filed titled "Dealers BRP USA" with SHUMOVICH.

x.      On or about August 22, 2022, Alaska Sled Tours LLC received its license and business certificate to conduct business in the State of Alaska.  On a date uncertain, the Alaska Sled Tours business certificate was added to CC-2's shared drive folder "USA BRP Confidentiality."

y.      Between on or about August 25 and on or about August 29, 2022, NEFEDOV forwarded questions from U.S. Company 1 about snow machines to SHUMOVICH, and SHUMOVICH and NEFEDOV exchanged emails regarding quotes for snow machines.

z.      On or about August 27, 2022, SHUMOVICH emailed NEFEDOV two quotes for snow machines from a U.S. snow machine  distributor ("U.S. Distributor 3"). NEFEDOV responded with comments on rebates, pricing, and stated that six snow machines had been placed on hold.

aa.     On or about August 29, 2022, NEFEDOV forwarded CC-1 an estimate for moving a snow machine from Anchorage, Alaska to the State of Washington. CC-1 stated that he was satisfied with the price

and told NEFEDOV to send local dealers his wish list of items. CC-1 further stated that he was ready to begin placing orders.

bb. On or about August 29, 2022, NEFEDOV purchased approximately $175,000 from Bank Account 1 via cashier's check (the "Cashier's Check").

cc. On or about August 29, 2022, NEFEDOV deposited the Cashier's Check in Bank Account 2, and transferred $106,519.93 to a personal Alaska-based bank account ("Bank Account 3").

dd. On or about August 30, 2022, NEFEDOV wrote two checks to U.S. Distributor 3, one for $46,581 and the other for $48,031, from Bank Account 2.

ee. On or about August 31, 2022, U.S. Distributor 3 created two Buyer's Orders for Alaska Sled Tours LLC, with identifying information for Sergey and email address sergey_nefedov@yahoo.com. One Buyer's Order was for the purchase of three 2022 Ski-Doo snow machines, for a total cost of $46,581; the other was for the purchase of an additional three 2022 Ski-Doo snow machines, for a total cost of $48,031.

ff. On or about August 31, 2022, NEFEDOV transferred approximately $106,519.93 from Bank Account 3 to a U.S. Distributor 1.

gg. On or about September 1, 2022, a U.S. snow machine distributor ("U.S. Distributor 4") drafted a Sales Deal Deposit Receipt for one

2022 Ski-Doo snow machine to be purchased by Sergey NEFEDOV. The receipt showed a credit card payment of $500.

hh.    On or about September 2, 2022, a U.S. snow machine Distributor ("U.S. Distributor 5") drafted two Sales Agreements for the purchase of two 2022 Ski-Doo snow machines for a total of $25,246. NEFEDOV was listed as the buyer and signatory on both agreements.

ii.    On or about September 4, 2022, SHUMOVICH exchanged text communications with "Korea Contact" about a shipment. Korea Contact stated that they had received money and asked if SHUMOVICH had any instructions, to which SHUMOVICH replied that it was a question for the customer located in Russia.

jj.    On or about September 7, 2022, U.S. Distributor 4 drafted a Buyer's Order for the purchase of a 2022 Ski-Doo snow machine for a cost of $17,258.50. The Buyer's Order listed Sergey NEFEDOV as the purchaser.

kk.    On or about September 9, 2022, U.S. Distributor 1 drafted a Bill of Sale for seven 2022 Ski-Doo snow machines, listing Alaska Sled Tours as the buyer, with contact information for Sergey Nefedov. The total cost of the purchase was $106,427.93.

ll.    On or about September 9, 2022, a withdrawal was made from Absolut Auto's Bank Account 2 for $25,246, the exact amount of the two Sales Agreements between Absolut Auto Sales and U.S. Distributor 5.

mm.    On or about September 12, 2022, NEFEDOV transferred $17,258.50 by wire from Bank Account 2 to U.S. Distributor 4.

nn.    On or about September 16, 2022, SHUMOVICH emailed reprinted invoices from a U.S.-based snow machine distributor that listed Absolut Auto Sales under the "Sold to" section and provided contact information for NEFEDOV and SHUMOVICH.

oo.    On or about September 17, 2022, using an end-to-end encrypted messaging platform, SHUMOVICH informed an associate with a phone number with a Russian country code that "The order for snowmobiles now is for $4 mln. From Kamchatka. With the current policies the import is hard with relevant issues, fines etc. But there are not unsolvable issues." He later stated to the associate on September 17, 2022, "They transport everything through Hong Kong. They have a route.".

pp.    On or about September 19, 2022, NEFEDOV emailed CC-1 snow machine Certificates of Origin from U.S.-based snow machine distributors.

qq.    On or about September 22, 2022, NEFEDOV wired $18,669 from Bank Account 2 to U.S. Distributor 2.

rr.    On or about September 27, 2022, U.S. Distributor 2 drafted a Bill of Sale showing NEFEDOV as the buyer of a 2022 Ski-Doo snow machine, for a total cost of $19,169, which matched the two payments

U.S. Distributor 2 received from NEFEDOV's bank accounts.

ss.     On or about September 28, 2022, NEFEDOV emailed SHUMOVICH snow machine Certificates of Origin, buyer orders from U.S. Distributor 3, and sales agreements from another U.S.-based snow machine distributor. The buyer orders showed payments in the exact amounts of the checks NEFEDOV wrote from Bank Account 2 to U.S. Distributor 3, as described above in paragraph 25(dd). The sales agreements showed the purchase of two snow machines for a $1,000 cash down payment with an outstanding total balance of approximately $25,000.

tt.     On or about September 28, 2022, NEFEDOV forwarded an email sent to SHUMOVICH containing sales agreements and Certificates of Origin for snow machines to CC-1.

uu.     On or about September 29, 2022, SHUMOVICH sent NEFEDOV an email with invoices from U.S. Distributor 3. SHUMOVICH had written on the invoices the total payment amount and the amount of each payment.

vv.     On or about September 29, 2022, SHUMOVICH sent information received from NEFEDOV to an employee of a U.S.-based shipping company for a quote to ship a container of snow machines to China or Korea. SHUMOVICH had, prior to March 2022, worked with the shipping company to ship goods, including snow machines, direct to

Russia. The employee of the shipping company refused to ship the snow machines, explaining to SHUMOVICH that companies that had previously shipped to Russia and now ship to China or Korea are facing delays and closer scrutiny, and that the employee did not believe the container would pass U.S. customs.

ww.     Between on or about September 29, 2022, and on or about October 13, 2022, SHUMOVICH emailed with additional U.S. shipping companies regarding shipping a container of snow machines to Hong Kong.

xx.     Between on or about October 6, 2022, and on or about October 24, 2022, SHUMOVICH discussed with an employee of U.S. Company 1 details related to the shipment of snow machines to Hong Kong. SHUMOVICH told the employee that his concern was delivery of the snow machines to the port, and that his colleague NEFEDOV would provide paperwork.

yy.     On or about October 14, 2022, Absolut Auto Sales received a wire transfer for approximately $121,660 sent to Bank Account 2 from Hong Kong Company. At a date unknown, NEFEDOV possessed a spreadsheet on a shared drive folder entitled "Copy of Balance ABSOLUT" that recorded the five wire transfers from Hong Kong Company to Absolut Auto Sales described above in paragraphs 25(o), (p), (u), (v), and (yy), and payments from Absolut Auto Sales to U.S.

Distributors 1 through 5, among others, from on or about August 5, 2022, through on or about October 28, 2022.

zz.     On or about October 26, 2022, SHUMOVICH received a notification from U.S. Distributor 3 that part or all of his order was ready for pick up.

aaa.    On or about November 17, 2022, NEFEDOV and SHUMOVICH received an email from U.S. Company 1 with instructions for wire payment, an invoice, and U.S. customs forms for completion for a shipment of snow machines to Hong Kong. On or about November 18, 2022, NEFEDOV forwarded the email to CC-1.

bbb.    On or about November 3, 2022, and November 14, 2022, NEFEDOV and SHUMOVICH caused false and misleading information to be communicated to U.S. Company 1 and placed into the Electronic Export Information paperwork to ship snow machines to Hong Kong. Specifically, NEFEDOV told U.S. Company 1 when initially requesting a rate for shipment that the snow machines were destined for Hong Kong. On or about October 26, 2022, SHUMOVICH informed U.S. Company 1 that the ultimate consignee for a shipment of snow machines was CC-2's Hong Kong Company. In fact, both shipments of snow machines were intended for an ultimate consignee in Russia.

//

ccc.    On or about November 18, 2022, U.S. Company 1 attempted to ship approximately $475,000 worth of snow machines and associated parts to CC-2's Hong-Kong based company to fulfill an order for Alaska Sled Tours LLC. The Vehicle Identification Numbers ("VIN")/Product Numbers for the seventeen total snow machines reported in the Electronic Export Information paperwork matched the VIN numbers of the seventeen snow machines that NEFEDOV purchased from U.S. Distributors 1 through 5 in August and September 2022. At a date unknown, a spreadsheet entitled "Paid Equipment" was added to CC-1's shared drive that included VINs that matched those on the seventeen snow machines that NEFEDOV and SHUMOVICH sought to have shipped, and included descriptions of where each snow machine was purchased (i.e., U.S. Distributor 1 through 5) and total amounts paid to each U.S. Distributor that matched the amounts paid by NEFEDOV and Absolut Auto Sales.

ddd.    On or about November 23, 2022, NEFEDOV forwarded CC-1 emails from a representative of U.S. Company 1 with updates on the shipment of snow machines.

eee.    On or about November 28, 2022, NEFEDOV completed and signed a false BIS-711 Form on behalf of Alaska Sled Tours LLC, which was identified as the exporter. Specifically, NEFEDOV falsely identified a company in South Korea as the ultimate consignee and CC-2's Hong

Kong-based company as the purchaser of the snow machines when NEFEDOV then knew, in truth and fact, that the snow machines were destined for Russia and that CC-1's Russian Company was the true end user.

fff.  On or about November 28, 2022, NEFEDOV caused to be submitted the falsified BIS-711 Form to the Department of Commerce.

ggg.  On or about December 2, 2022, CBP detained the snow machines and associated parts that NEFEDOV and SHUMOVICH attempted to export.

hhh.  On or about December 7, 2022, NEFEDOV forwarded another email from U.S. Company 1 to CC-1. The email contained an update on the delayed shipment and an update from U.S. customs authorities about the detention of the snow machines.

iii.  On or about April 5, 2023, CBP seized the snow machines and associated parts.

jjj.  In or about May 2023, NEFEDOV caused another person to falsely inform the U.S. Government, specifically, CBP, that Alaska Sled Tours intended to ship the snow machines to an end user and final destination of Hong Kong.

All in violation of Title 18, United States Code, Section 371.

//

//

## **COUNT 2**
### Violation of the Export Control Reform Act
### (50 U.S.C. § 4819)

26.     Paragraphs 1 through 25 of this Indictment are re-alleged and incorporated

by referenced as if fully set forth herein.

27.     Beginning no later than on or about March 16, 2022, and continuing to at

least in or about May 2023, in the District of Alaska and elsewhere, the defendants

SERGEY NEFEDOV and MARK SHUMOVICH, together with others known and

unknown, did willfully attempt to export and cause the exportation of luxury goods,

specifically snow machines, from the United States to Russia without first having obtained

the required license or authorization from the Department of Commerce.

All in violation of Title 50, United States Code, Sections 4819(a)(1), 4819(a)(2)(A),

and 4819(b); Title 15, Code of Federal Regulations, Sections 736.2(b), 746.10, Supp. No.

5 to Part 746, and 764.2; Title 18, United States Code, Section 2.

## **COUNT 3**
### Violation of the Export Control Reform Act
### (50 U.S.C. § 4819)

28.     Paragraphs 1 through 27 of this Indictment are re-alleged and incorporated

by referenced as if fully set forth herein.

29.     On or about November 28, 2022, in the District of Alaska and elsewhere, in

connection with the preparation and submission of an export control document and report

filed and required to be filed pursuant to the EAR, and for the purpose of and in connection

with effecting an export of an item subject to the EAR, Defendant SERGEY NEFEDOV,

together with others known and unknown, made a false and misleading representation,

statement, and certification, and falsified and concealed a material fact directly, and indirectly through another person, to the Department of Commerce, to wit, on a BIS-711 Form submitted in connection with the export of snow machines NEFEDOV falsely identified the ultimate consignee as a company in South Korea and the purchaser as a company in Hong Kong, when in truth and fact, as NEFEDOV then knew, the snow machines were destined for Russia and end users in Russia.

All in violation of Title 50, United States Code, Sections 4819(a)(1), 4819(a)(2)(F), and 4819(b); Title 15, Code of Federal Regulations, Part 758, and Title 18, United States Code, Section 2.

## COUNT 4
Smuggling Goods from the United States
(18 U.S.C. § 554)

30.     Paragraphs 1 through 29 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

31.     Beginning no later than on or about March 16, 2022, and continuing to at least in or about May 2023, in the District of Alaska and elsewhere, the defendants SERGEY NEFEDOV and MARK SHUMOVICH, together with others known and unknown, did knowingly and fraudulently attempt to export and send from the United States merchandise, articles, and objects, to wit, snow machines, contrary to laws and regulations of the United States, including Title 50, United States Code, Section 4819(a)(2)(F), Title 15, Code of Federal Regulations, Parts 30 and 758, and Title 13, United States Code, Section 305, and did facilitate the transportation, concealment, and sale of merchandise, articles, and objects, to wit, snow machines, prior to exportation, knowing

the same to be intended for exportation contrary to laws and regulations of the United States, that is, Title 50, United States Code, Section 4819(a)(2)(F), Title 15, Code of Federal Regulations, Parts 30 and 758, and Title 13, United States Code, Section 305.

All in violation of Title 18, United States Code, Sections 554(a) and 2.

## COUNTS 5-6
Submitting False or Misleading Export Information
(13 U.S.C. § 305)

32.　　Paragraphs 1 through 31 of this Indictment are re-alleged and incorporated by referenced as if fully set forth herein.

33.　　On or about the following dates, in the District of Alaska and elsewhere, Defendants SERGEY NEFEDOV and MARK SHUMOVICH, together with others known and unknown, knowingly and willfully submitted and caused to be submitted false and misleading export information through the Automated Export System in connection with shipments of snow machines:

| Count | Date |
|-------|------|
| 5 | November 3, 2022 |
| 6 | November 14, 2022 |

All in violation of Title 13, United States Code, Section 305(a), and Title 18, United States Code, Section 2.

//

//

//

## COUNT 7
### Conspiracy to Commit Money Laundering
### (18 U.S.C. § 1956(h))

34.     Paragraphs 1 through 33 of this Indictment are re-alleged and incorporated by referenced as if fully set forth herein.

35.     Between at least on or about March 16, 2022 through at least in or about May 2023, the exact dates being unknown to the Grand Jury, in the District of Alaska and elsewhere, Defendants SERGEY NEFEDOV and MARK SHUMOVICH, together with others known and unknown, including individuals associated with Hong Kong Company and Russian Company, did knowingly and willfully combine, conspire, confederate, and agree together and with each other, to commit offenses in violation of Title 18, United States Code, Section 1956, that is, to knowingly transport, transmit, and transfer, and attempt to transport, transmit, and transfer, monetary instruments and funds to a place in the United States from and through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(2)(A). It is further alleged that the specified unlawful activity is a violation of Title 18, United States Code, Section 554.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNTS 8-12
### International Money Laundering
### (18 U.S.C. § 1956(a)(2)(A))

36.     Paragraphs 1 through 35 of this Indictment are re-alleged and incorporated by referenced as if fully set forth herein.

37.     On or about the dates listed for each count, within the District of Alaska and elsewhere, Defendant SERGEY NEFEDOV did knowingly transport, transmit, and transfer, attempt to transport, transmit, and transfer, monetary instruments and funds to a place in the United States from and through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, to wit, violations of Title 18, United States Code, Section 554:

| Count | Approximate Date of Wire Transfer | Monetary Instrument and Funds | Sent to USA From | Exported Items |
|-------|-----------------------------------|-------------------------------|------------------|----------------|
| 8 | August 5, 2022 | $1,975 | Hong Kong | snow machines |
| 9 | August 9, 2022 | $174,975 | Hong Kong | snow machines |
| 10 | August 15, 2022 | $97,122 | Hong Kong | snow machines |
| 11 | August 17, 2022 | $187,212 | Hong Kong | snow machines |
| 12 | October 14, 2022 | $121,660 | Hong Kong | snow machines |

All in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 2.

## CRIMINAL FORFEITURE ALLEGATION 1
(Export and Smuggling Offenses)

The Grand Jury realleges and incorporates the allegations of Counts 1 through 4 of this Indictment, which are incorporated by reference as though fully set forth herein.

Pursuant to Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853; Title 22, United States Code, Section 401; Title 28, United States Code, Section 2461(c); Title 50, United States Code, Section 4819(d); and upon conviction of one or more of the offenses alleged in Counts 1 through 4 of this Indictment, the

defendants SERGEY NEFEDOV and MARK SHUMOVICH, shall forfeit to the United States all right, title, and interest in: (a) any articles intended to be or are being or have been exported or removed from the United States in violation of law; (b) any vessel, vehicle, or aircraft containing the same which has been or is being used in exporting or attempting to export such articles; (c) any and all property used or intended to be used in any manner or part to commit or to facilitate the commission of a violation of Title 50, United States Code, Section 4819(b), or constituting or traceable to gross proceeds taken, obtained, or retained, in connection with or as a result of the violation, or constituting an item or technology that is exported or intended to be exported in violation thereof, and (d) any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of Title 50, United States Code, Section 554, or conspiracy to commit such offense(s) including, but not limited to, the following property:

(1) Seventeen (17) snow machines described in Electronic Export Information forms ITN X20221103979455 and ITN X20221114591639 with the following VIN/Product Numbers:

    a. 2BPSAUNA9NV000159

    b. 2BPSAUNAXNV000168

    c. 2BPSAMNA9NV000078

    d. 2BPSAMNA7NV000094

    e. 2BPSAMNA5NV000112

    f. 2BPSAMNA9NV000095

    g. 2BPSASNA8NV000089

    h.  2BPSAUPB8PV000016

    i.  2BPSANPA9PV000281

    j.  2BPSAFNP3NV000044

    k.  2BPSAKNB1NV000184

    l.  2BPSAMNA4NV000103

    m. 2BPSAMNA9NV000114

    n.  2BPSAMNA6NV000118

    o.  2BPSAKNAXNV000367

    p.  2BPSAMNBXNV000082

    q.  2BPSALNA9NV000222.

If any of the above-described forfeitable property, as a result of any act or omission of the defendant(s):

    (1) cannot be located upon the exercise of due diligence;

    (2) has been transferred or sold to, or deposited with, a third party;

    (3) has been placed beyond the jurisdiction of the court;

    (4) has been substantially diminished in value; or

    (5) has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States to seek forfeiture of any other property of said defendant(s) up to the value of the above-described forfeitable property, pursuant to Title 21, United States Code, Section 853(p).

//

By virtue of the commission of the offenses alleged in this Indictment, any and all interest the defendants have in the above-described property is vested in and forfeited to the United States.

All in accordance with Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853; Title 22, United States Code, Section 401; Title 28, United States Code, Section 2461(c); Title 50, United States Code, Section 4819(d); and Rule 32.2(a) of the Federal Rules of Criminal Procedure.

## CRIMINAL FORFEITURE ALLEGATION 2
(False Filing Offenses)

The Grand Jury realleges and incorporates the allegations of Counts 1 and 5 through 6 of this Indictment, which are incorporated by reference as though fully set forth herein.

Pursuant to Title 13, United States Code, Section 305(a)(3), upon conviction under Title 13, United States Code, Section 305, the defendants SERGEY NEFEDOV and MARK SHUMOVICH, shall, in addition to any other penalty under the statute, forfeit to the United States:

a.  all interest in, security of, claim against, or property or contractual rights of any kind in the goods or tangible items that were the subject of the violation;

b.  all interest in, security of, claim against, or property or contractual rights of any kind in tangible property that was used in the export or attempt to export that was the subject of the violation;

c.  all property constituting, or derived from, any proceeds obtained directly or indirectly as a result of the violation.

All in accordance with Title 13, United States Code, Section 305(a)(3); Title 21, United States Code, Section 853; Title 28, United States Code, Section 2461(c); and Rule 32.2(a) of the Federal Rules of Criminal Procedure.

## CRIMINAL FORFEITURE ALLEGATION 3
### (Money Laundering Offenses)

The Grand Jury realleges and incorporates the allegations of Counts 7 through 12 of this Indictment, which are incorporated by reference as though fully set forth herein.

Pursuant to Title 18, United States Code, Section 982(a)(1), upon conviction under Title 18, United States Code, Section 1956, defendant(s) SERGEY NEFEDOV and MARK SHUMOVICH, shall forfeit to the United States of America any property, real or personal, involved in such offense(s), or any property traceable to such property involved in the offense(s), or conspiracy to commit such offense(s), including, but not limited to, the following property:

(1) Seventeen (17) snow machines described in Electronic Export Information forms ITN X20221103979455 and ITN X20221114591639 with the following VIN/Product Numbers:

   a. 2BPSAUNA9NV000159

   b. 2BPSAUNAXNV000168

   c. 2BPSAMNA9NV000078

   d. 2BPSAMNA7NV000094

   e. 2BPSAMNA5NV000112

   f. 2BPSAMNA9NV000095

        g.  2BPSASNA8NV000089

        h.  2BPSAUPB8PV000016

        i.  2BPSANPA9PV000281

        j.  2BPSAFNP3NV000044

        k.  2BPSAKNB1NV000184

        l.  2BPSAMNA4NV000103

        m. 2BPSAMNA9NV000114

        n.  2BPSAMNA6NV000118

        o.  2BPSAKNAXNV000367

        p.  2BPSAMNBXNV000082

        q.  2BPSALNA9NV000222.

If any of the above-described forfeitable property, as a result of any act or omission of the defendant(s):

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third party;

(3) has been placed beyond the jurisdiction of the court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States to seek forfeiture of any other property of said defendant(s) up to the value of the above-described forfeitable property, pursuant to Title 21, United States Code, Section 853(p).

All in accordance with Title 18, United States Code, Section 982(a)(1); Title 21, United States Code, Section 853, Title 28, United States Code, Section 2461(c); and Rule 32.2(a) of the Federal Rules of Criminal Procedure.

A TRUE BILL.

s/ Grand Jury Foreperson
GRAND JURY FOREPERSON

s/ Adam Alexander
ADAM ALEXANDER
Assistant U.S. Attorney
United States of America

s/ Adam Alexander for
LESLIE ESBROOK
Trial Attorney
United States of America

s/ Michael J. Heyman
MICHAEL J. HEYMAN
United States Attorney
United States of America

DATE:    July 16, 2025